UNITED STATES DISTRICT COURT
SOUTHERN DISTRICT OF WEST VIRGINIA
AT CHARLESTON

CARL CONLEY, an individual,

      Plaintiff,

v.                         Civil Action No. 2:13-cv-32654

A. J. RYAN, an individual, and
RYAN & RYAN, ATTORNEYS AT LAW and
MICHAEL SPARKS, individually and in his
official capacity as the
Prosecutor of Mingo County, and
DOES 1 THROUGH 60, inclusive,

      Defendants.

<u>MEMORANDUM OPINION AND ORDER</u>

      Pending is the individual motion to dismiss of defendant Michael Sparks, filed March 18, 2014, and a joint motion to dismiss by defendants A.J. Ryan and Ryan & Ryan, Attorneys at Law, filed March 18, 2014.

I. Background

      Plaintiff Carl Conley ("Conley") is a resident of Mingo County, West Virginia.  He was formerly employed by the West Virginia Department of Transportation Division of Highways ("DOH").  Defendant Michael Sparks ("Sparks") was the elected county prosecuting attorney of Mingo County, West Virginia. Defendant A. J. Ryan ("Ryan") is an attorney who maintains his law office, Ryan & Ryan, Attorneys at Law, in Williamson, in

Mingo County.  Ryan & Ryan is also a defendant.  The parties'
memoranda reveal that Ryan and Ryan is the trade name of a firm
of which Ryan is the sole proprietor.  As the claims alleged
against the individual and the firm are identical, when the
court refers to Ryan, both are included.

Conley instituted this action on December 19, 2013.
It initially included several other defendants, against whom
claims have been voluntarily dismissed, including Dallas Toler,
a Mingo County magistrate, Norman Mines, a Mingo County deputy
sheriff, and Michael Thornsbury, a West Virginia circuit court
judge sitting in Mingo County.  Conley contends that he was
arrested on a "bogus" drug charge after he reported the improper
use of state property by one of Judge Thornsbury's business
partners.  See Pl. Compl. ¶¶ 11-20.  The allegations of the
plaintiff that follow are taken as true for purposes of the
motion to dismiss.

Conley's story begins in the summer of 2010.  On July
19, 2010 he was injured in a car accident in which he was
apparently faultless inasmuch as he was a passenger in a vehicle
that was rear-ended.  Id.  ¶¶ 11-12.  His injuries caused him to
miss about a month of work at the DOH.  Id. ¶ 14.  Sometime
after returning to work Conley became aware that a DOH vehicle
was being used for non-governmental purposes by the Thornsbury

2

business partner.  Id. ¶ 15.  During this non-governmental use, the vehicle became stuck in the mud and DOH employees were dispatched to assist in its retrieval.  Id. ¶ 16.  Following this incident, Conley filed an internal complaint concerning the private use of government property.  Id.  After filing the complaint, Conley was summoned to a meeting with DOH supervisors and told to "stop running his mouth" and that the non-governmental use of the machine was "none of his f---ing business."  Id. ¶ 18.

A month after that meeting, Conley was arrested on "bogus drug charges" involving pain medication that is not otherwise described.  Id. ¶ 19, ¶ 20.  One of Conley's neighbors stole the medication out of his truck and immediately thereafter Conley was "surrounded by law enforcement officers" and arrested.  Id.  Conley was then "coerced . . . into confessing to the crime on video" by his friend, Deputy Joe Smith, after being promised that he could go home if he confessed.  Id. ¶ 21. The charge led the DOH to fire Conley, and the confession was used against him at his hearing for unemployment benefits.  Id. ¶ 22, ¶ 23.

According to Mingo County public records relating to Conley's criminal proceeding, he was arrested, committed and arraigned on October 20, 2010, on two state felony drug offenses

occurring on that same date, consisting of possession of controlled substances with intent to deliver and conspiracy to do so, and designated as case numbers 10F-638 and 10F-639.  See Ex. 3 Def. Ryan's Mot. for Summ. J.  He was represented by court-appointed counsel, Lauren Thompson.  Id.  He was scheduled for a preliminary hearing on October 27, 2010, but he waived preliminary hearing and was released on bond on October 27, 2010.  Id.  On the same date, he was bound over to Mingo County Circuit Court on both charges, which then became criminal action number 10-B-79.  Id.  See Philips v. Pitt County Mem'l Hosp., 572 F.3d 176, 180 (4th Cir. 2009)("[When] reviewing a Rule 12(b)(6) dismissal, [the reviewing court] may properly take judicial notice of matters of public record.").

In his complaint, Conley alleges that, prior to his arrest, he had retained Ryan to pursue a civil suit seeking damages for the injuries he suffered in the July 2010 car accident.  Pl. Compl. ¶ 26.  Conley further alleges that when he reported to "Home Confinement" for the fitting of his ankle collar, presumably as a condition of his bond, Sparks told Conley that his criminal counsel, Lauren Thompson, was "not good for his case," and asked him if he had any money.  Id. ¶ 25.  When Conley then told Sparks that he was being represented by Ryan in his civil case, Sparks told him that switching to Ryan

4

"would be good for him on this case." Id. ¶ 27.  Sparks also told Conley, when he appeared for his arraignment, that if he "proceeded with a preliminary hearing at the arraignment, there would be no deals in the future." Id. ¶ 29.  Then, at the arraignment, Sparks "threatened" him "by telling him that you cannot find a Mingo County jury that would not convict anyone on a drug charge." Id.

        Conley later met with Ryan and discussed having him become his defense counsel.  Id. at ¶ 30.  Ryan informed Conley that "he could get a misdemeanor conviction and time served if he paid $3,000.00."  Ryan further told him, "'For $3,000, I can get it down to a misdemeanor. You were getting 2 to 20,'" apparently meaning years in prison.  Id.  Ryan told Conley that the $3,000 attorney's fee for the criminal case could be deducted from any settlement money obtained in the civil suit he was already handling for him.  Id. ¶ 31.  Conley retained Ryan for what was then criminal action No. 10-B-79.  Id. ¶ 40.

        Ryan advised Conley that he should settle the civil case because "the felony charges could lead to the dismissal" of the civil case.  Id. ¶ 34.  Following this advice, Conley chose to settle the civil case.  Id. ¶ 33.  He received a sum that did not satisfy his already-accrued medical expenses of $14,562.00 and his lost wages of $3,427.20, and did not cover the cost of

surgery to repair a shoulder injury caused by the accident.  Id.
¶¶ 32-33.

Conley remained on home confinement, perhaps for over
a year, before the criminal case was finally resolved on January
12, 2012, when Conley pled guilty before Magistrate Toler to two
misdemeanor drug charges (possession and conspiracy to possess),
filed that same day as case numbers 12M-57 and 12M-58.  Id.  ¶¶
36, 85.  He was represented on that occasion by Diane Carter
Wiedel whom he says "permitted him to plead guilty" to
misdemeanor charges that were filed that very day, "more than
one year after they were alleged to have occurred."  Id. ¶ 86.
Though not alleged, Wiedel may have been appearing for Ryan.

Conley was apparently sentenced to twelve months of
home confinement that he had already served.  Id. ¶ 35 ¶ 36.
Conley contacted Ryan at some point to "get him off of home
confinement."  Id. ¶ 37.  Despite his requests, Conley remained
on home confinement for an "additional four months."  Id. ¶ 38.

Conley's complaint contains nine counts.  The first
six counts set forth claims solely against Ryan.  Count Seven
contains two tort of outrage claims alleged separately against
Ryan and Sparks.  Count Eight names only Diana Carter Wiedel,
Conley's counsel at the hearing on January 12, 2012, where he

6

plead guilty to two misdemeanor charges. She has already been dismissed but Count Eight otherwise remains. Count Nine initially contained claims against Norman Mines, Dallas Toler, Michael Thornsbury, and Michael Sparks; only the claim against Sparks remains. Each count incorporates by reference the allegations contained in all paragraphs preceding it.

Count One alleges that Ryan committed legal malpractice while representing Conley in both the civil and criminal matters. Id. ¶ 40. Counts Two and Three are contract-based reformulations of the malpractice claims: Count Two alleges breach of contract, while Count Three alleges a breach of the duty of good faith. Id. ¶ 45, ¶ 52-53.

Count Four alleges that Ryan committed fraud when he advised Conley that his civil case "would be dismissed because felony charges had been filed against him." Id. ¶ 57-59, ¶ 61. Count Five sets forth essentially the same claim as Count Four, but is styled as a claim of intentional misrepresentation. Id. ¶ 65, ¶ 68-69. Count Six relies on the same theory as the previous two counts, but is formulated as a claim for negligent misrepresentation. Id. ¶ 73-75.

Count Seven assert claims for outrage, one against against Ryan for the way in which he handled Conley's legal

7

representation, and the other against Sparks for his handling of the criminal prosecution.  Id. ¶ 79-82.

Count Eight alleges that Conley's counsel at his plea hearing, Diana Carter Wiedel, committed malpractice by allowing him to "plead guilty to misdemeanor charges that were filed more than one year after they were alleged to have occurred."  Id. ¶ 86.

Count Nine contends that Sparks deprived Conley of his constitutional rights and asserts a claim under 42 U.S.C § 1983 ("Section 1983").  Id. ¶¶ 90-95.  Specifically, Conley asserts that Sparks' unconstitutional conduct resulted in him "spending 16 months on home confinement for crimes he did not commit".  Id. ¶ 94.

## II. The Motion to Dismiss Standard

Federal Rule of Civil Procedure 8(a)(2) requires a plaintiff's complaint to contain "a short and plain statement of the claim showing . . . entitle[ment] to relief."  Fed. R. Civ. P. 8(a)(2); Erickson v. Pardus, 551 U.S. 89, 93 (2007).  Rule 12(b)(6) correspondingly permits a defendant to challenge a complaint when it "fail[s] to state a claim upon which relief can be granted . . . ."  Fed. R. Civ. P. 12(b)(6).

8

The required "short and plain statement" must provide
"'fair notice of what the . . . claim is and the grounds upon
which it rests.'" Bell Atlantic Corp. v. Twombly, 550 U.S. 544,
545 (2007) (quoting Conley v. Gibson, 355 U.S. 41, 47 (1957),
overruled on other grounds, Twombly, 550 U.S. at 563); see also
Anderson v. Sara Lee Corp., 508 F.3d 181, 188 (4th Cir. 2007).
The showing of an "entitlement to relief" must amount to "more
than labels and conclusions . . . ." Twombly, 550 U.S. at 555.
"[A] formulaic recitation of the elements of a cause of action
will not do." Id.; Giarratano v. Johnson, 521 F.3d 298, 304
(4th Cir. 2008). To survive a motion to dismiss, "a complaint
must contain sufficient factual matter, accepted as true, to
'state a claim to relief that is plausible on its face.'"
Ashcroft v. Iqbal, 556 U.S. 662, 678 (2009) (quoting Twombly,
550 U.S. at 570); see also Monroe v. City of Charlottesville,
579 F.3d 380, 386 (4th Cir. 2009).

The complaint need not, however, "make a case" against
a defendant or even "forecast evidence sufficient to prove an
element" of the claim. Chao v. Rivendell Woods, Inc., 415 F.3d
342, 349 (4th Cir. 2005) (quoting Iodice v. United States, 289
F.3d 270, 281 (4th Cir. 2002)). "Threadbare recitals of the
elements of a cause of action, supported by mere conclusory
statements, [will] not suffice"; however, a complaint "does not

9

require 'detailed factual allegations.'" _Ashcroft v. Iqbal_, 556
U.S. 662, 678(2009).  Instead, it need only contain "[f]actual
allegations . . . [sufficient] to raise a right to relief above
the speculative level." _Twombly_, 550 U.S. at 555; _Iqbal_, 556
U.S. at 678 (2009)(a complaint "demands more than an unadorned,
the-defendant-unlawfully-harmed-me accusation.").  Stated
succinctly, the complaint must allege "enough facts to state a
claim to relief that is plausible on its face." _Twombly_, 550 at
569; _Giarratano_, 521 F.3d at 302.

     When evaluating a motion to dismiss, a district court
is required to "'accept as true all of the factual allegations
contained in the complaint . . . .'" _Erickson_, 551 U.S. at 94
(quoting _Twombly_, 550 U.S. at 555-556); _see also_ _South Carolina
Dept. Of Health And Environmental Control v. Commerce and
Industry Ins. Co._, 372 F.3d 245, 255 (4th Cir. 2004) (quoting
_Franks v. Ross_, 313 F.3d 184, 192 (4th Cir. 2002)).  Factual
allegations are to be distinguished from legal conclusions,
which the court need not accept as true.  _Iqbal_, 556 U.S. at 678
("the tenet that a court must accept as true all of the
allegations contained in a complaint is inapplicable to legal
conclusions").  The court must also "draw[] all reasonable . . .
inferences from th[e] facts in the plaintiff's favor . . . ."
_Edwards v. City of Goldsboro_, 178 F.3d 231, 244 (4th Cir. 1999).

### III. Counts One through Seven

As noted, the first six counts of Conley's complaint set forth common law claims against Ryan.  Count Seven contains a common law claim against both Ryan and Sparks.

### Count One – Attorney Malpractice

In West Virginia, in a suit against an attorney for negligence, as in Count One, a plaintiff must establish three elements: 1) the existence of an attorney-client relationship, 2) the attorney's neglect of a reasonable duty, and 3) proximate cause of any damage suffered.  Keister v. Talbott, 182 W. Va. 745, 748 (1990), see also id. at n.3 ("We have recognized that a legal malpractice action may sound in tort or in contract. The pleadings in this case clearly indicate that the plaintiffs instituted a negligence action. However, the principles discussed in this opinion apply equally to actions for breach of contract.")(internal citations omitted).

Conley alleges that Ryan committed malpractice while carrying out both his civil and criminal representation.  Pl. Compl. ¶ 41.  Ryan does not dispute the existence of an attorney-client relationship in either case.  Instead he argues that Conley's malpractice claim fails as a matter of law because Conley has not pled facts establishing the neglect of a

11

reasonable duty.

Ryan also argues that Conley cannot assert malpractice related to Ryan's representation in the criminal matter because Conley has not pled "actual innocence" of the underlying criminal charge.  While it is true that West Virginia requires a criminal defendant to assert actual innocence before bringing a malpractice claim against his defense counsel, Humphries v. Detch, 227 W. Va. 627, 633 (2011), Conley's repeated references to the charges to which he plead guilty as "bogus" tends to satisfy this requirement.  It is clear from the content of his complaint that Conley is asserting that his confession was coerced and that he is actually innocent of the charges to which he pled guilty.  Further, to the extent Conley's criminal malpractice claim is based, if at all, on a failure by Ryan to obtain Conley's release from home confinement after the acceptance of the plea, the question of actual innocence seems irrelevant.

Ryan's motion to dismiss focuses on portions of the complaint comprised of legal conclusions.  See e.g., Pl. Compl. ¶ 41.  Ryan cites Iqbal for the proposition that "such statements of bare legal conclusions are insufficient to state a claim."  This citation, while a correct statement of doctrine, is not dispositive here.  Although Ryan refers to portions of

12

the complaint that may be nothing more than legal conclusions, the complaint contains factual allegations of sufficient substance to support a plausible claim of malpractice.  See Pl. Compl. ¶¶ 32-34, ¶¶ 37-38.

        With respect to Ryan's conduct in the civil case, it is alleged that Ryan incorrectly advised Conley to settle the civil case because he was facing a felony charge which "could" or "would" result in his claim being dismissed.  Id. ¶ 34, ¶ 57. Ryan also suggested that funds acquired by settling the civil case could be used to pay his attorney's fee in the criminal case.  Id. ¶ 31.  Acting on this advice, Conley settled the civil case for a sum that didn't cover his already accrued medical costs or pay for doctor-recommended shoulder surgery. Id.  These allegations provide the basis for a claim predicated on Ryan's failure to provide Conley legal advice of a commensurate quality to that which would be provided by an attorney of ordinary "knowledge, skill, and ability."  Keister, 182 W.Va. at 749.

        In addition, the complaint implies that Ryan provided the erroneous advice in order to ensure that Conley could pay his $3,000 fee for criminal representation.  Acting in pursuit of his own financial gain, rather than in the best interests of his client, is a clear violation of the duty of loyalty an

13

attorney owes his clients, a duty that West Virginia law describes as an "essential element[] of the attorney-client relationship." Delaware CWC Liquidation Corp. v. Martin, 213 W. Va. 617, 622 (2003). Thus, the complaint's factual assertions and reasonable inferences are enough to establish a plausible claim of legal malpractice related to the civil case.

With respect to Ryan's conduct pertaining to the criminal case, Count One charges that Ryan "neglected reasonable duties to plaintiff." That allegation includes Ryan's alleged failure to get him off home confinement beyond twelve months. Whether that failure stems from not moving the case sooner to resolution or from not obtaining his release from home confinement once he had served his sentence of twelve months home confinement, or both, is not clear.

West Virginia law imposes a duty of diligence on attorneys when representing their clients. See Martin, 213 W. Va. at 622 (2003)("the attorney-client relationship [is a relationship] of the highest fiduciary nature, calling for the utmost good faith and diligence on the part of [the] attorney")(emphasis added), see also West Virginia Rules Professional Conduct 1.3 ("A lawyer shall act with reasonable diligence and promptness in representing a client."). Ryan's alleged lack of diligence resulted in Conley spending an

14

additional four months on home confinement.  Pl. Compl. ¶¶ 37-
38.  Conley's allegation that Ryan failed to act with reasonable
promptness in discharging his duties implicates both the neglect
of a legally imposed duty and resulting damage.  Accordingly,
the complaint contains allegations sufficient to render
plausible his claim for malpractice related to Ryan's handling
of the criminal case.

        Consequently, Conley's complaint contains sufficient
factual allegations to support a claim of attorney malpractice
against Ryan with respect to both his civil and criminal
representation of Conley.  Count One thus survives the motion to
dismiss.

    Count Two – Breach of Contract

        In West Virginia, legal malpractice can be pursued
under either a tort or contract theory.  <u>Harrison v. Casto</u>, 165
W. Va. 787, 788 (1980)("A client who has suffered damages as the
result of his attorney's negligence or misconduct may seek
recovery therefor in an action at law . . . [that] . . . may be
based on tort arising from the negligence of the attorney, or
may be grounded on contract.")(internal citations omitted).
Although malpractice is actionable under either, the theories
are not interchangeable: an action will sound under one or the

15

other, depending upon the nature of the conduct that is the source of the client's injury.  Hall v. Nichols, 184 W. Va. 466, 468-69 (1990).  In Hall, the West Virginia Supreme Court of Appeals explained that when "the essential claim of the action is a breach of a duty imposed by law upon the relationship of attorney/client . . . the action [sounds] in tort." Id. at 469 (internal citation omitted).  In contrast, "only when the [actionable conduct of the attorney] pertains specifically to the 'terms of the contract without any reference to the legal duties imposed by law upon the [attorney/client] relationship . . .' is the cause of action contractual in nature." Id. (internal citation omitted.).

Conley's complaint alleges that Ryan, acting under the false pretense that the felony drug charges could or would result in dismissal of his civil suit, committed malpractice when he convinced Conley to settle the civil case for less than what it was worth.  The complaint also alleges that it was malpractice when Ryan failed to act promptly in pursuing the termination of Conley's home confinement period.  Conley alleges that he entered into contracts with Ryan concerning his representation in both the civil and criminal matters.  Pl. Compl. ¶ 45.  He further alleges that Ryan breached those contracts.  Id. at ¶ 48.  Ryan does not deny the existence of

such contracts.  Instead, he argues that the breach of contract claim fails as a matter of law because "there is no specific term or provision of any contract that plaintiff alleges was breached by Defendant . . . [and] such [a] claim[] ha[s] not been stated to the requisite degree and should be dismissed." Def. Ryan's Mem. of Law in Supp. Mot. to Dismiss at * 7-8 n. 3.

Although no contract was attached to the complaint, the failure to make explicit references to contractual language does not cause a breach of contract claim to fail as a matter of law.  Highmark West Virginia, Inc. v. Jamie, 221 W. Va. 487, 492-93 (2007)(holding that "while a breach of contract may best be alleged in the express words of the contract, the use of such words is not necessary.").  The factual assertions in the complaint leave no doubt that Ryan acted as Conley's attorney. See Pl. Compl. ¶ 30, ¶ 31, ¶ 33, ¶ 34, ¶ 40, ¶ 41.  Moreover, West Virginia law treats the attorney/client relationship as "a matter of contract," even in the absence of a written document. State ex rel. DeFrances v. Bedell, 191 W.Va. 513, 517 (1994)(per curiam), see also State ex rel. Bluestone Coal Corp. v. Mazzone, 226 W. Va. 148, 159 (2010)("Whether an attorney-client relationship has been established is a matter of contract, and such contract may be evidenced either by written agreement or by implication.").

The complaint contains sufficient factual assertions to establish that there was in fact a contractual agreement between Conley and Ryan concerning Ryan's representation of Conley in both the civil and criminal cases.  Additionally, the factual allegations that are sufficient to support the claims of malpractice sounding in tort are also sufficient to make plausible Conley's claim that Ryan violated the terms of the alleged contracts, and thereby committed malpractice sounding in contract.  Accordingly, Count Two survives the motion to dismiss.

    Count Three – Breach of the Duty of Good Faith

    West Virginia law recognizes that all contracts implicitly contain a covenant of good faith and fair dealing. See e.g., Powell v. Bank of America, N.A., 842 F. Supp. 2d 966, 981 (S.D. W. Va. 2012)("West Virginia law 'implies a covenant of good faith and fair dealing in every contract for purposes of evaluating a party's performance of that contract.'")(internal citation  omitted).  However, courts sitting in West Virginia have held that the breach of this implied covenant does not create a cause of action independent of a claim for breach of contract.  See Highmark West Virginia, 221 W. Va. at 492 (2007)("it has been held that an implied covenant of good faith and fair dealing does not provide a cause of action apart from a

18

breach of contract claim")(citing Stand Energy Corp. v. Columbia
Gas Transmission, 373 F.Supp.2d 631, 644 (S.D. W. Va. 2005));
Barn-Chestnut, Inc. v. CFM Dev. Corp., 193 W.Va. 565, 571
(1995)("[t]he implied covenant of good faith and fair dealing
cannot give contracting parties rights which are inconsistent
with those set out in the contract."); see also Doyle v.
Fleetwood Homes of Virginia, Inc., 650 F. Supp. 2d 535, 541
(S.D. W. Va. 2009)("In light of Barn-Chesnut and Highmark it
seems clear that West Virginia's Supreme Court does not
understand the duty of good faith, either at common law or under
the U.C.C., to exist independently, or outside the scope of, the
contract in which it is implied."). Accordingly, inasmuch as
Count Three is intended to state a cause of action independent
of Count Two, it is dismissed.

    Count Four - Fraud

        In Lengyel v. Lint, the West Virginia Supreme Court of
Appeals set forth the applicable standard for proving fraud:

>    The essential elements in an action for fraud are:(1)
>    that the act claimed to be fraudulent was the act of the
>    defendant or induced by him; (2) that it was material
>    and false; that plaintiff relied upon it and was
>    justified under the circumstances in relying upon it;
>    and (3) that he was damaged because he relied upon it.

Syl. pt. 1 Lengyel v. Lint, 167 W. Va. 272 (1981).  This

standard applies to intentional acts of deceit, as well as to
unintentional or negligent acts when the party making a false
representation has a "duty to know . . . [that] the
[representations are] untrue."  Id. at 277("An action for fraud
may lie where the defendant either knows the statement to be
false, makes the statement without knowledge as to its truth or
falsity, or makes it under circumstances such that he should
have known of its falsity.")(citing State v. Berkeley, 41 W.Va.
455 (1895)), see also Kidd v. Mull, 215 W. Va. 151, 157
(2004)(citing Syl. pt. 1 Horton v. Tyree, 104 W.Va. 238 (1927)
("Where one person induces another to enter into a contract by
false representations which he is in a situation to know, and
which it is his duty to know, are untrue, he, in contemplation
of law, does know the statements to be untrue, and consequently
they are held to be fraudulent, and the person injured has a
remedy for the loss sustained by an action for damages. It is
not indispensable to a recovery that the defendant actually knew
them to be false.")).

     When making an allegation of fraud in federal court, a
plaintiff must meet the heightened pleading requirements set
forth in Rule 9, which requires that a party must "state with
particularity the circumstances constituting [the] fraud."  F.
R. Civ. P. 9(b).  To satisfy Rule 9(b), a plaintiff "must, at a

minimum, describe the time, place, and contents of the false representations, as well as the identity of the person making the misrepresentation and what he obtained thereby." <u>United States ex rel. Wilson v. Kellogg Brown & Root, Inc.</u>, 525 F.3d 370, 379 (4th Cir. 2008), <u>see</u> <u>also</u> <u>U.S. ex rel. Nathan v. Takeda Pharm. N. Am., Inc.</u>, 707 F.3d 451, 456 (4th Cir. 2013)(noting that the Rule 9 standard set forth in <u>Wilson</u> is "as applicable in cases brought under [the statute at issue in <u>Wilson</u>] as [it is] <u>in other fraud cases</u>")(emphasis added).

The plaintiff has met the Rule 9(b) standard.  Conley alleges that he was induced into a detrimental minimal settlement of his civil case that advantaged only Ryan when Ryan advised him that the felony criminal charges filed against him could or would result in dismissal of the civil action.  Pl. Compl. ¶¶ 32-34, ¶¶ 57-59.  Whether Ryan made such a material misstatement and, if so, whether Ryan knew and was charged with knowledge of its falsity, as distinguished from professing a mere matter of permissible opinion, is at the core of the fraud claim.  Accordingly, Count Four contains a particularly-pled, plausible claim for fraud and thus survives the motion to dismiss.

Count Five - Intentional Misrepresentation

21

In West Virginia, courts apply the standard for fraud when evaluating a claim for intentional misrepresentation.  Syl. pt. 6, <u>Folio v. City of Clarksburg</u>, 221 W.Va. 397 (2007)("Fraud includes intentional misrepresentation and the elements required to prove each tort overlap").  As discussed above, Conley's fraud claim is properly pled.  Accordingly, Count Five also survives the motion to dismiss.

   Count Six - Negligent Misrepresentation

      Unknowing misrepresentations are actionable if the person making the representation did so recklessly, without knowledge of its accuracy, or if the misrepresentation is made under circumstances where the law imposes a "duty to know."  <u>See</u> <u>Lengyel</u>, <u>Kidd</u>, <u>Horton</u>, <u>supra</u>.  The West Virginia Supreme Court of Appeals has confirmed that this standard permits claims for negligent misrepresentation.  <u>Folio</u>, 221 W. Va. at 405 (citing, <u>inter alia</u>, <u>Kidd</u>, <u>Horton</u>, and <u>James v. Piggott</u>, 70 W.Va. 435 (1910)).  Because Conley has successfully pled a claim for fraud, he has also successfully set forth a claim for negligent misrepresentation.  Accordingly, Count Six states a claim for relief that can be granted and survives the motion to dismiss.

   Count Seven - Outrage

West Virginia recognizes a cause of action for intentional or reckless infliction of emotional distress.  Syl. pt. 6 <u>Harless v. First Nat. Bank in Fairmont</u>, 169 W.Va. 673 (1982).  In <u>Travis v. Alcon Laboratories, Inc.</u>, the West Virginia Supreme Court of Appeals set forth a four-part test by which the "tort of outrage"[1] is proven:

> [I]n order for a plaintiff to prevail on a claim for intentional or reckless infliction of emotional distress, four elements must be established. [The four elements are]: (1) that the defendant's conduct was atrocious, intolerable, and so extreme and outrageous as to exceed the bounds of decency; (2) that the defendant acted with the intent to inflict emotional distress, or acted recklessly when it was certain or substantially certain emotional distress would result from his conduct; (3) that the actions of the defendant caused the plaintiff to suffer emotional distress; and, (4) that the emotional distress suffered by the plaintiff was so severe that no reasonable person could be expected to endure it.

202 W. Va. 369, 375 (1998).  To qualify as legally outrageous, a defendant's conduct must be "'more than unreasonable, unkind or unfair; it must truly offend community notions of acceptable conduct.'"  <u>Id.</u>(internal citation omitted).  "Liability clearly does not extend to mere insults, indignities, threats, annoyances, petty oppressions, or other trivialities."  <u>Tanner v. Rite Aid of West Virginia</u>, 194 W.Va. 643, 651 (1995)(citing the Restatement (Second) of Torts § 46(1) (1965)).  The

---

[1] "Intentional or reckless infliction of emotional distress [is] also called the 'tort of outrage.'"  <u>Travis v. Alcon Labs., Inc.</u>, 202 W. Va. 369, 374 (1998).

Restatement definition used in Tanner goes on to explain that for behavior to be actionable it must be "so extreme in degree[] as to go beyond all possible bounds of decency[] and [thus] be regarded as atrocious, and utterly intolerable in a civilized community." Id.

Conley brings separate outrage claims against Ryan and Sparks. Ryan moved to dismiss on the basis that Conley's complaint contains insufficient facts to establish that his behavior was legally outrageous. Ryan also argues that Conley has not established the requisite amount of emotional distress to proceed with an outrage claim. Sparks seeks refuge from the claim under the shield of the absolute immunity afforded to prosecutors who are engaged in a judicial or quasi-judicial role.

The allegations in the paragraphs that make up Count Seven are all "formulaic recitations of the elements of a cause of action." See Pl. Compl. ¶¶ 79-83. As such, they are legal conclusions and do not help Conley establish the basis for his claim of outrage. While Conley has pled numerous facts detailing Ryan's conduct during the course of his representation, none of these allegations concern behavior that qualifies as outrageous for this purpose. Conley acknowledges that the complaint is bereft of the necessary factual support,

24

but argues that the claim should survive because "under the
notice pleading standard . . . the claim has been sufficiently
plead and its dismissal would be premature."  See Pl. Resp. in
Opp'n at * 10.  This argument is unavailing.  As explained at
length at pages 7 through 9, in federal court, a claim cannot
survive a motion to dismiss without sufficient factual
allegations.  Accordingly, the claim of outrage against Ryan is
insufficiently pled and must be dismissed.

Sparks does not challenge the factual sufficiency of
the claim of outrage, instead raising the defense of absolute
immunity.  The court need not analyze his immunity defense in
this context inasmuch as the complaint fails to assert facts
sufficient to support a claim for intentional infliction of
emotional distress against Sparks.  Although the complaint
contains some factual assertions concerning Sparks' behavior,
the essence of the allegations against him – summarized in the
next two paragraphs below – do not meet the high standard
required for the tort of outrage.  Accordingly, the claim of
outrage against Sparks fails as a matter of law and must be
dismissed.

IV. Count Nine - Section 1983 Claim

Count Nine asserts a Section 1983 claim against

Sparks, the former prosecuting attorney in Mingo County, West Virginia.[2] The complaint brings both a personal and an official capacity claim against him. Pl. Compl. ¶ 90 ("Under color of state law and in their official capacities . . ."). Count Nine incorporates the entirety of the allegations of the complaint that precede Count Nine. As to Sparks, those allegations consist of the following. Sparks "threatened Plaintiff, Carl Conley, and was responsible for him pleading guilty to bogus criminal charges." Id. ¶ 8. The threat is not there specified, but as earlier noted, it is also alleged as follows:

> When Plaintiff, Conley appeared for his arraignment, Defendant, Michael Sparks further informed him that if he proceeded with a preliminary hearing at the arraignment, there would be no deals in the future. Defendant, Michael Sparks then threatened Plaintiff at the arraignment by telling him that you cannot find a Mingo County jury that would not convict anyone on a drug charge.

Id. ¶ 29. Presumably, that is the threat earlier referenced. No other threat is described in the complaint.

In addition, it is alleged, as has been noted, that "[w]hen Plaintiff, Carl Conley reported to Home Confinement for

---

[2] Conley initially raised Section 1983 claims against Toler, Mines and Thornsbury, but as noted, those claims have been voluntarily dismissed. Citations to the language of the complaint which contain plural pronouns are a relic of the since dismissed claims.

the fitting of his ankle collar, . . . Sparks informed Plaintiff
that Lauren Thompson 'was not good for his case,' and asked him
if he had any money." Id. ¶ 25. At that point, Conley told
Sparks he was being represented by Ryan for the automobile
accident. Id. ¶ 26. It is next alleged by Conley that Sparks
told him, "Ryan would be good for him on this case." Id. ¶ 27.

After incorporating the foregoing into Count Nine, it
is there alleged that Sparks, along with the other now dismissed
defendants, violated § 1983 "by depriving Plaintiff, Carl
Conley, of his constitutional rights in that Defendant elected
officials in Mingo County had no jurisdiction to charge
Plaintiff with or to accept Plaintiff's guilty plea to
misdemeanor charges that were filed more than one year after
they were alleged to have occurred, ... [thereby] depriving
Plaintiff of his constitutional right to liberty", id. ¶ 90,
"resulting in him spending 16 months on home confinement for
crimes he did not commit." Id. ¶ 94. It is further alleged
that "[t]hese actions were not taken ... in a good-faith use of
their authority, but were taken against Plaintiff, Carl Conley
maliciously and sadistically to cause him harm," Id. ¶ 91, and
"[t]hese actions ... were objectively unreasonable in that they
had no legal right to take them." Id. ¶ 93.

27

Thus, Count Nine admits of two claims against Sparks. First, that he undertook to deprive Conley of his Sixth Amendment right to counsel of his own choosing; and second, that he prosecuted Conley on two stale misdemeanors.

The court observes that Ryan confidently asserted that he could get the felony drug charges reduced to misdemeanor status.  That seems to be exactly what happened.  Conley, who gave a confession he alleges was coerced, pled down to two misdemeanors.  He now alleges that because the misdemeanors were not prosecuted within one year of the occurrence on which they were based, there was no jurisdiction to proceed because the statute of limitations had run.  See W.Va. Code § 61-11-9.

Sparks has moved to dismiss.  He asserts that dismissal is required because his actions were covered by absolute prosecutorial immunity.

A. Generally

Section 1983 provides a private right of action to individuals who have suffered a violation of a right afforded to them in the United States Constitution by someone acting under the purported authority of one of the sovereign states.  Hafer v. Melo, 502 U.S. 21, 27 (1991)("Through § 1983, Congress sought

'to give a remedy to parties deprived of constitutional rights, privileges and immunities by a [state] official's abuse of his position.'")(quoting <u>Monroe v. Pape</u>, 365 U.S. 167, 172 (1961)). Section 1983 reads, in pertinent part:

> Every person who, under color of any statute, ordinance, regulation, custom, or usage, of any State or Territory or the District of Columbia, subjects, or causes to be subjected, any citizen of the United States or other person within the jurisdiction thereof to the deprivation of any rights, privileges, or immunities secured by the Constitution and laws, shall be liable to the party injured in an action at law, suit in equity, or other proper proceeding for redress[.]

42 U.S.C. § 1983.  In <u>United States v. Classic</u>, the Supreme Court demarcated the boundaries of conduct that constitutes action under "color of state law," explaining that, "[m]isuse of power, possessed by virtue of state law and made possible only because the wrongdoer is clothed with the authority of state law, is action taken 'under color of' state law."  <u>United States v. Classic</u>, 313 U.S. 299, 326 (1941), <u>see also</u> <u>Monroe</u>, 365 U.S. at 187 (adopting <u>Classic</u> standard in Section 1983 suits).

Section 1983 claims must be raised against a "person." The parameters of that designation are often at issue when assessing whether or not a suit filed nominally against a person is actually a suit against a non-person entity.[3]  <u>See</u> <u>e.g.</u>, <u>Will</u>

---

[3] Some local government entities, such as municipalities, are considered persons for the purposes of Section 1983, and thus

<u>v. Michigan Dept. of State Police</u>, 491 U.S. 58 (1989)(Suit against Director of State Police in official capacity was actually suit against the state itself, which is not a person for purposes of Section 1983).  Government officials, as natural persons, fit within the definition of a person contemplated by Section 1983 so long as they are sued in their personal, not official, capacity.  <u>Hafer</u>, 502 U.S. at 27 ("State officers sued for damages in their official capacity are not 'persons' for purposes of the suit because they assume the identity of the government that employs them. By contrast, officers sued in their personal capacity come to court as individuals.  A government official in the role of personal-capacity defendant thus fits comfortably within the statutory term 'person.'")(internal citations omitted).

"[T]he distinction between official-capacity suits and personal-capacity suits is more than 'a mere pleading device.'"  <u>Id.</u>(quoting <u>Will,</u> 491 U.S. at 71.).  As the Supreme Court explained in <u>Kentucky v.Graham</u>:

> Personal-capacity suits seek to impose personal liability upon a government official for actions he takes under color of state law. Official-capacity suits, in contrast, generally represent only another way of pleading an action against an entity of which an officer is an agent . . . an official-capacity suit is, in all

official-capacity suits can be maintained against them.  <u>See</u> <u>Monell v. Dep't of Soc. Servs.</u>, 436 U.S. 658 (1978).

> respects other than name, to be treated as a suit
> against the entity. It is not a suit against the
> official personally, for the real party in interest is
> the entity.

473 U.S. 159, 165-66 (1985)(internal citations and quotation

marks omitted).  The distinction is relevant at the motion to

dismiss stage for two reasons.  First, it is often dispositive

in a Section 1983 suit, because the plain language of the

statute only permits actions against persons, and thus an action

against a defendant in his official capacity fails as a matter

of law if his official capacity is an alter-ego of a state.

Second, the posture of the claim dictates what types of immunity

a defendant may properly invoke: an official in a personal-

capacity action "may, depending on his position, be able to

assert personal immunity defenses," while in an action against

the same named defendant in an official-capacity action, "the

only immunities that can be claimed . . . are forms of sovereign

immunity . . . such as the Eleventh Amendment."  Id. at 166-67.


    B. Official-Capacity Claim


        Conley's official-capacity claim against Sparks can

proceed only if Sparks was an employee, and therefore agent, of

a political sub-division of West Virginia, not the state itself.

Counties, like municipalities, are political subdivisions of a

state that can qualify as a "person" under Section 1983.  See

e.g., Pembaur v. City of Cincinnati, 475 U.S. 469, 485
(1986)("[a] county may therefore be held liable under § 1983").
When determining whether or not a government official is an
agent of the state or of a political subdivision for the
purposes of Section 1983, the "inquiry is dependent on an
analysis of state law." McMillian v. Monroe County, 520 U.S.
781, 785 (1997).

     Under West Virginia law, a county prosecutor pursuing
a criminal prosecution exercises the authority of the state.
See Syl. Pt. 2 State ex rel. Preissler v. Dostert, 163 W.Va. 719
(1979)( "The prosecuting attorney is a constitutional officer who
exercises the sovereign power of the State at the will of the
people and he is at all times answerable to them"), see also
State ex rel. Morrisey v. W. Virginia Office of Disciplinary
Counsel, 234 W. Va. 238, 764 S.E.2d 769, 788 (2014)(noting that
"[it is] the duty of the [county] prosecuting attorney to attend
to the criminal business of the State in the county in which he
is elected and qualified . . ." and that "[g]enerally speaking,
the [county] prosecutor has exclusive authority to prosecute
criminal offenses at the trial level in the name of the
state.")(internal citations omitted)).

     West Virginia law also holds that a public employee is
considered an employee of the entity that can exercise control

over that employee.  Atkinson v. County Comm'n of Wood County,
200 W.Va. 380, 383 (W.Va. 1997)("The pivotal consideration in
determining whether an individual is an employee of a given
entity is whether the purported employer has the power of
control over the individual.").  A review of West Virginia law
suggests that, at least in some respects, county prosecutors are
subject to the control of county government.  See Amoroso v.
Marion County Comm'n, 172 W. Va. 342, 346 (1983)("County
commissions . . . set the budgets for [the] offices of [elected]
county officials."); The Governmental Tort Claims and Insurance
Reform Act, W. Va. Code § 29-12A-3 (Definition of "employee"
includes "any elected or appointed official of a political
subdivision" and definition of "political subdivision"
encompasses counties), Beckley v. Crabtree, 189 W. Va. 94
(1993)(holding that county sheriff, an elected county official,
qualified as a county employee under Government Tort Claims and
Insurance Reform Act), see also W.Va. Code § 7-7-7 (requiring
county prosecutors to obtain express consent of the county
commission before appointing assistant prosecutors), Morrisey,
764 S.E.2d. at 781 ("[T]he intent of W. Va. Code § 7-7-7 'was
for the county [commission] initially to confirm or refuse to
confirm a [prosecutor's] appointees as part of our system of
checks and balances. Without that authority, the county
[commission] cannot effectively discharge its overall

33

responsibilities in governing the county.'")(quoting <u>State ex</u>
<u>rel. Dingess v. Scaggs</u>, 156 W. Va. 588, 590 (1973)).

 Although West Virginia law has not spoken definitively
on the subject, the decisions in <u>Dostert</u> and <u>Morrisey</u> suggest
that when acting in a prosecutorial, rather than administrative,
capacity a county prosecutor acts on behalf of (and is therefore
subject to the control of) the state itself.  <u>Cf.</u> <u>Beightler v.</u>
<u>Office of Essex County Prosecutor</u>, 342 F. App'x 829, 832 (3rd
Cir. 2009)(per curiam)(Section 1983 case analyzing New Jersey
law and holding that "when [county] prosecutors engage in
classic law enforcement and investigative functions, they act as
officers of the state."), <u>Esteves v. Brock</u>, 106 F.3d 674, 678
(5th Cir. 1997)("Texas law makes clear . . . that when acting in
the prosecutorial capacity to enforce state penal law, a [local
prosecutor] is an agent of the state, not of the county in which
the criminal case happens to be prosecuted."), <u>Pusey v. City of</u>
<u>Youngstown</u>, 11 F.3d 652, 657 (6th Cir. 1993)(holding that
although city prosecutor was employee of municipality, "state
criminal laws . . . represent the policy of the state"; and that
Section 1983 liability was precluded because "[the prosecutor]
acts as a state agent when prosecuting state criminal charges .
. . [and therefore] the suit against [the prosecutor] in her
official capacity is to be treated as a suit against the

34

state."), <u>Owens v. Fulton County</u>, 877 F.2d 947, 952 (11th Cir. 1989)(analyzing Georgia law and holding that a local prosecutor engaged in criminal prosecution did not incur Section 1983 liability because in "Georgia [the prosecutor's] relationship to the county involves merely budgetary and administrative matters. The alleged violation of . . . constitutional rights, however, arises out of the [prosecutor]'s exercise of discretion in the prosecution of state offenses, a state-created power.").

Accordingly, the official-capacity claim against Sparks fails as a matter of law, inasmuch as, when acting in his prosecutorial role, Sparks was acting on behalf of the state which is not a person within the meaning of Section 1983, and thus is not amenable to such a suit under the statute.

C. Personal-Capacity Claim

There is no jurisdictional impediment to a Section 1983 suit against Sparks in his personal capacity. Against this claim, Sparks raises the defense of absolute prosecutorial immunity.

At common law, both judges and prosecutors enjoyed absolute immunity for actions taken within the scope of the judicial process. <u>Imbler v. Pachtman</u>, 424 U.S. 409, 422-24

(1976), <u>Pierson v. Ray</u>, 386 U.S. 547, 554 (1967).  Absolute
immunity has considerable breadth: in <u>Pierson</u>, the Supreme Court
noted that such immunity "applies even when [a] judge is accused
of acting maliciously and corruptly" because it is essential
that judges be "at liberty to exercise their functions with
independence and without fear of consequences."  <u>Pierson</u>, 386
U.S. at 554.  Similarly, in <u>Imbler</u>, the Supreme Court explained
that "the prosecutor [is] absolutely immune" from charges of
malicious prosecution, and that this broad grant of immunity was
"based upon the same considerations that underlie the common-law
immunities of judges . . . acting within the scope of their
duties."  <u>Imbler</u>, 424 U.S. at 421, 423.  The Supreme Court has
subsequently confirmed that this extensive protection is
available against Section 1983 claims.  <u>Briscoe v. LaHue</u>, 460
U.S. 325, 334 (1983)("[I]n light of common-law immunity
principles, § 1983 d[oes] not impose liability" on "judges,
prosecutors, and other persons acting under 'color of law' who
perform official functions in the judicial process.").

        Although the scope of absolute prosecutorial immunity
is vast, it is not unlimited.  Absolute immunity extends "only
to those functions which are 'intimately associated with the
judicial phase of the criminal process.'"  <u>Allen v. Lowder</u>, 875
F.2d 82, 85 (4th Cir. 1989)(quoting <u>Imbler</u>, 424 U.S. at 430).

36

Any action taken by a prosecutor in service of his role as an advocate on behalf of the state is covered by absolute immunity. Ehrlich v Guiliani, 910 F.2d 1220, 1222 (4th Cir. 1990)(holding that prosecutorial conduct that falls in the range of a prosecutor's "advocacy" duties warrant absolute immunity), see also Cady v. Arenac County., 574 F.3d 334, 340 (6th Cir. 2009) ("The analytical key to prosecutorial immunity . . . is advocacy — whether the actions in question are those of an advocate"). In contrast, when engaged in "actions extraneous to the judicial process," prosecutors are shielded only by qualified immunity.[4] Ehrlich, 910 F.2d. at 1223 n. 3.  The burden of establishing that absolute immunity is applicable in a given situation falls on the party seeking immunity.  Burns v. Reed, 500 U.S. 478, 486 (1991)("An official seeking absolute immunity bears the burden of showing that such immunity is justified.")

        Separating that which is "intimately associated with . . . the judicial process" from that which is "extraneous" is not an exact science, nor is there a precise metric capable of

---

[4] Qualified immunity "shield[s] [government officials] from civil damages liability as long as their actions could reasonably have been thought consistent with the rights they are alleged to have violated."  Anderson v. Creighton, 483 U.S. 635, 638 (1987), see also Malley v Briggs, 475 U.S. 335, 340 (1986)("Qualified immunity . . . [protects] all but the plainly incompetent or those who knowingly violate the law.").  Sparks has not invoked qualified immunity in his motion to dismiss.

determining whether or not a prosecutor has doffed his advocate's hat when engaged in a particular activity.  See Forrester v. White, 484 U.S. 219, 227 (1988)("This Court has never undertaken to articulate a precise and general definition of the class of acts entitled to [absolute] immunity."). Nevertheless, by examining the various contexts in which absolute immunity has been extended, one can begin to ascertain its boundaries.  Absolute immunity clearly covers a prosecutor's actions and statements made during a hearing, trial, or other judicial proceeding.  See Kalina v. Fletcher, 522 U.S. 118, 125 (1997)(reviewing precedent and noting that absolute immunity extends to any situation in which the prosecutor "serve[s] as an advocate in [a] judicial proceeding."), see also Burns v. Reed, 500 U.S. 478, 490 (1991).

Absolute immunity also extends to a prosecutor's activities outside of a judicial proceeding that have an undeniable link to the criminal process, such as asking a grand jury to return an indictment, Malley v. Briggs, 475 U.S. 335, 343 (1986)("we shield the prosecutor seeking an indictment [with absolute immunity] because any lesser immunity could impair the performance of a central actor in the judicial process"), see also Burns 500 U.S. at 490 n. 6 (noting "widespread agreement" in the Courts of Appeals that "prosecutors are absolutely immune

from liability under § 1983 for their conduct before grand juries"), engaging in plea negotiations, <u>Taylor v. Kavanagh</u>, 640 F.2d 450, 453 (2d Cir. 1981)(absolute immunity covers a prosecutor's actions taken during plea bargaining because "[t]he plea negotiation is an 'essential component' of our system of criminal justice"), and preparing evidence for presentation at a trial or other hearing, <u>Buckley v. Fitzsimmons</u>, 509 U.S. 259, 273 (1993)(holding that absolute immunity covers a prosecutor's out of court action to the extent such action involves the "professional evaluation of the evidence assembled by the police and appropriate preparation for its presentation at trial or before a grand jury.", <u>see also</u> <u>Imbler</u> 424 U.S. at 430 n. 32 (characterizing prosecutor's efforts to "control the presentation of his witness' testimony" as a "task fairly within his function as an advocate" and therefore protected by absolute immunity).

With these precedents in mind, it is easy to determine that the Section 1983 claim directly articulated in Count Nine – that Sparks prosecuted Conley on misdemeanors subject to the bar of the one-year statute of limitations – is foreclosed by absolute immunity.  <u>Imbler</u> dictates that a prosecutor's decision to initiate and pursue criminal charges is shielded by absolute immunity and cannot create civil liability under any

39

circumstance.  Moreover, Conley chose to plead guilty to those misdemeanor offenses, resulting in dismissal of the related felony charges.

Protected as well by absolute immunity are the following comments Sparks is said to have made to Conley at or about the time of his arraignment.  Falling within the realm of plea negotiations is Sparks' statement that if Conley proceeded with a preliminary hearing "there would be no deals in the future."  So, too, is the statement attributed to Sparks that Mingo County juries don't acquit defendants charged with drug offenses.

However, the Sixth Amendment based claim, relating to comments Sparks made concerning Conley's choice of defense counsel, rests on a different footing.  It is first to be noted that Conley does not specifically cite the Sixth Amendment anywhere in his pleading.  Indeed, Sparks argues that he need not address Conley's Sixth Amendment based claim at all because it is not explicitly stated in the complaint.  But while Conley's failure to expressly invoke the Sixth Amendment by name renders the legal theory articulated in Count Nine imprecise, the legal sufficiency of a complaint is assessed by examining its factual allegations, not the precision with which a plaintiff articulates the legal framework of a particular claim.

See <u>Topchian v. JPMorgan Chase Bank, N.A.</u>, 760 F.3d 843, 848-49 (8th Cir. 2014)("The well-pleaded facts alleged in the complaint, not the legal theories of recovery or legal conclusions identified therein, must be viewed to determine whether the pleading party . . . [has] stated a claim . . . The failure in a complaint to cite a statute, or to cite the correct one, in no way affects the merits of the claim. Factual allegations alone are what matters. Accordingly, a complaint should not be dismissed merely because a plaintiff's allegations do not support the particular legal theory he advances, for the court is under a duty to examine the complaint to determine if the allegations provide for relief on any possible theory.")(internal citations and quotation marks omitted).

Dismissal of a Section 1983 claim is not warranted where the only deficiency in the complaint is an inartfully pled legal theory. <u>Cf</u> <u>Johnson v. City of Shelby, Miss.</u>, 135 S. Ct. 346, 347 (2014)(per curiam)(Reversing Fifth Circuit's decision to sustain dismissal of a Section 1983 claim where the plaintiffs failed to expressly invoke the statute in their complaint, noting that "[o]ur decisions in <u>Bell Atlantic Corp.</u> <u>v. Twombly</u> and <u>Ashcroft v. Iqbal</u> are not in point, for they concern the factual allegations a complaint must contain to survive a motion to dismiss. Petitioners' complaint was not

41

deficient in that regard. Petitioners stated simply, concisely, and directly events that, they alleged, entitled them to damages from the city. Having informed the city of the factual basis for their complaint, they were required to do no more to stave off threshold dismissal for want of an adequate statement of their claim."), see also Leatherman v. Tarrant County Narcotics Intelligence and Coordination Unit, 507 U.S. 163 (1993)(rejecting a heightened pleading standard for Section 1983 claims).

Precedent indicates that it is proper for a court reviewing a Section 1983 claim to conduct an inquiry into the plaintiff's factual allegations to determine the exact source of the alleged constitutional violation.  As the Supreme Court explained in Graham v. Conner, because Section 1983 is "not itself a source of substantive rights, but merely provides a method for vindicating federal rights elsewhere conferred . . . analysis [of a Section 1983 claim] begins by identifying the specific constitutional right allegedly infringed."  Graham v. Conner, 490 U.S. 386, 394 (1989)(internal citations omitted)(Overturning Court of Appeals decision in which the panel decided a Section 1983 claim "[w]ithout attempting to identify the specific constitutional provision under which that claim arose"), see also Baker v. McCollan, 443 U.S. 137, 140

("The first inquiry in any § 1983 suit" is "to isolate the precise constitutional violation with which [the defendant] is charged")).

Conley's complaint outlines the factual allegations earlier noted of Sparks' extrajudicial statements to Conley that disparaged Conley's appointed counsel and recommended Ryan.  See Pl. Compl. ¶¶ 24-29.  These statements appear to have been made after Conley's initial appearance and appointment of counsel by the court, as well as after his arraignment, by which time Conley's Sixth Amendment right to counsel had attached.  See Rothgery v. Gillespie County, 554 U.S. 191, 198, 213 (2008)(criminal defendant's initial appearance before magistrate, where he learns charge against him and his liberty is subject to restriction, marks initiation of adversary proceedings that trigger attachment of Sixth Amendment right to counsel).  Thus these allegations, which are incorporated by reference in Count Nine, see id. at ¶ 89, can be plausibly construed as an assertion that Sparks interfered with Conley's Sixth Amendment right to be represented by counsel of his choice, see Caplin & Drysdale, Chartered v. United States, 491 U.S. 617, 624-625 (1989)("the Sixth Amendment guarantees a defendant the right to be represented by an otherwise qualified attorney whom that defendant can afford to hire, or who is

willing to represent the defendant even though he is without funds."). Accordingly, the inquiry into the Sixth Amendment claim, plausibly raised by the complaint's factual allegations, is proper.

Sparks bears the burden of proving that his comments should be protected. Burns, 500 U.S at 486, see also Forrester 484 U.S. at 224("Officials who seek exemption from personal liability have the burden of showing that such an exemption is justified by overriding considerations of public policy"), Malley 475 U.S. at 340 ("state officers who 'seek absolute exemption from personal liability for unconstitutional conduct must bear the burden of showing that public policy requires an exemption of that scope.'")(internal citation omitted).

Sparks made his disparaging comments concerning Lauren Thompson, Conley's court-appointed counsel, when Conley was being fitted for a home confinement ankle bracelet. See Pl. Compl. ¶¶ 24-29. Thus, those statements were made outside a judicial proceeding and had no connection to Sparks' protected role as an advocate for the State. Conley subsequently abandoned Thomas and engaged Ryan, as suggested by Sparks who, under these circumstances, could be regarded as making an offer Conley ought not refuse.

Thus, it is quite plausible to construe Sparks'
comments about Thompson as a direct and proximate cause of
Conley's decision to retain new counsel.  A prosecutor's
disparaging comments about defense counsel that undermine the
defendant's confidence in that attorney and ultimately led him
to retain new counsel have been held to violate the Sixth
Amendment.  See United States v. Amlani, 111 F.3d 705, 711-12
(9th Cir. 1997)(stating that a prosecutor's comments which
"disparage[] defense counsel . . . and cause[] [the defendant]
to retain different counsel" would qualify as a Sixth Amendment
violation), see also Maine v. Moulton, 474 U.S. 159, 171
(1985)("The Sixth Amendment . . . imposes on the State an
affirmative obligation to respect and preserve the accused's
choice to seek [the assistance of counsel]. We have on several
occasions been called upon to clarify the scope of the State's
obligation in this regard, and have made clear that, at the very
least, the prosecutor and police have an affirmative obligation
not to act in a manner that circumvents and thereby dilutes the
protection afforded by the right to counsel."), United States v.
Morrison, 602 F.2d 529 (3d Cir. 1979) rev'd on others grounds,
449 U.S. 361 (1981)(holding that statements by law enforcement
agents that "attacked the dedication and competence of [the
defendant's] lawyer and attempted to raise doubts in her mind
about his effectiveness" constituted a "deliberate attempt to

destroy the attorney-client relationship and to subvert the defendant's right to effective assistance of counsel.").

As noted, the burden of demonstrating that absolute immunity is warranted falls on Sparks.  That burden has not been met.  Sparks has not offered an explanation as to how his statements concerning the identity of Conley's counsel, made outside of and without any connection to a formal judicial proceeding or process, fit into his role as an advocate of the state.  Nor has he explained what public policy or interest would be served by extending the protection of absolute immunity to prosecutors who make such comments in that context.

Accordingly, Sparks' motion to dismiss the personal-capacity suit insofar as it relates to the Sixth Amendment claim is denied.

## V. Conclusions and Order

As set forth above, the court has evaluated all the counts and claims challenged by both motions to dismiss.  The court summarizes its conclusions as follows:

The motion to dismiss of defendant Ryan and defendant law firm Ryan and Ryan is granted as to Counts Three and Seven, and the court hereby ORDERS those claims dismissed.  The motion

is denied as it pertains to Counts One, Two, Four, Five, Six, and Eight.

Defendant Sparks' motion is granted as to Count Seven and the official-capacity claim contained in Count Nine, and the court hereby ORDERS those claims dismissed.  Sparks' motion as to the personal-capacity claim in Count Nine is granted as to all but the Sixth Amendment claim, and the court hereby ORDERS the personal-capacity claim in Count Nine dismissed except for the Sixth Amendment claim.

The Clerk is directed to transmit copies of this order to counsel of record and any unrepresented parties.

ENTER: March 13, 2015

John T. Copenhaver, Jr.
United States District Judge

47